AO 120 (Rev. 08/10)

| TO: | **Mail Stop 8**<br>**Director of the U.S. Patent and Trademark Office**<br>**P.O. Box 1450**<br>**Alexandria, VA 22313-1450** | **REPORT ON THE**<br>**FILING OR DETERMINATION OF AN**<br>**ACTION REGARDING A PATENT OR**<br>**TRADEMARK** |
|---|---|---|

In Compliance with 35 U.S.C. § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been filed in the U.S. District Court _____ Middle District - Tampa _____ on the following

☒ Trademarks or  ☐ Patents .  ( ☐ the patent action involves 35 U.S.C. § 292.):

| DOCKET NO.<br>8:25-cv-01887-WFJ-TGW | DATE FILED<br>7/18/2025 | U.S. DISTRICT COURT<br>Middle District - Tampa | |
|---|---|---|---|
| PLAINTIFF<br><br>Pacific Lock Company<br><br>also known as<br><br>Paclock | | DEFENDANT<br><br>Proven Industries, Inc.<br><br>Ronald Lee, II | |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | See Attached | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following patent(s)/ trademark(s) have been included:

| DATE INCLUDED | INCLUDED BY | | |
|---|---|---|---|
| | ☐ Amendment  ☐ Answer  ☐ Cross Bill  ☐ Other Pleading | | |
| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK<br>Elizabeth Warren | (BY) DEPUTY CLERK<br>FLY | DATE<br>7/21/2025 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Director    Copy 3—Upon termination of action, mail this copy to Director**
**Copy 2—Upon filing document adding patent(s), mail this copy to Director    Copy 4—Case file copy**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Pacific Lock Company,
a/k/a PacLock,

        Plaintiff,

v.

Proven Industries, Inc., and
Ronald Lee, II,

        Defendants.

_____/

CASE NO.:

## COMPLAINT AND DEMAND FOR JURY TRIAL
### (Injunctive Relief Sought)

Plaintiff, Pacific Lock Company, a/k/a Paclock ("PacLock"), sues Defendants,

Proven Industries, Inc. ("Proven") and Ronald Lee, II ("Mr. Lee") (collectively,

"Defendants"), alleging the following:

## INTRODUCTION

1.    Proven, at the direction of its founder and sole owner, Mr. Lee, are

intentionally and blatantly deceiving the purchasing public by prominently, but falsely,

advertising that the locks sold by Proven are "Made in the USA!". They are not. Mr.

Lee testified under oath as Proven's corporate representative that many of the locks

sold by Proven are made in China and that the vast majority of the lock cores – the

actual locking mechanisms used in the locks—are made in China and Finland.

2.    This is an action against Proven and Mr. Lee by PacLock, one of

Proven's competitors, seeking remedies for Proven's: (i) false and deceptive advertising

under the Lanham Act, 15 U.S.C. § 1125(a); and (ii) violation of The Florida Deceptive and Unfair Trade Practices Act, ("FDUTPA"), Section 501.201 et seq., Florida Statutes.

## PARTIES

3.  PACLOCK is a California corporation with its principal place of business at 25605 Hercules Street, Valencia, California 91355

4.  Proven is a Florida corporation with its principal place of business at 2310 South Dock Street, Unit 111, Palmetto, Florida 34221.

5.  Mr. Lee is an individual who resides in the State of Florida, Hillsborough County.  Mr. Lee is Proven's founder, President, and one hundred percent (100%) owner and controls and directs Proven's actions described in this Complaint.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over PacLock's claim against Defendants for violation of the Lanham Trademark Act under 28 U.S.C. §1331. This Court has pendent jurisdiction over PacLock's claim for Defendants' violation of FDUTPA under 28 U.S.C. §1367.

7.  This Court possesses personal jurisdiction over Proven and Mr. Lee because they each reside in Hillsborough County, Florida.

8.  This Court is the proper venue for this action because the causes of action at issue arose in Hillsborough County, Florida.

## <u>GENERAL ALLEGATIONS</u>

**<u>Proven's False "Made in USA" Claims on Its Website</u>**

9.     Proven aggressively advertises and markets to the purchasing public that its locks are "MADE IN THE USA", "Our locks are made 100% in the USA!", and "Made 100% USA" and similar claims. For example, the "Our Story" page of its website ([www.provenlocks.com](www.provenlocks.com)) ("Proven's Website"), Proven prominently states:



We pride ourselves in manufacturing our products in America! By doing so, we are able to ensure more control over the development and delivery of our products to our consumers.

Many manufactured products from other countries are made there in order to make production as cheap as possible. In addition, products manufactured overseas often utilize the cheapest materials available.

Don't sell yourself short on purchasing a security product manufactured out of cheap materials to save a few bucks. We manufacture all of our products with the intention of keeping all of your expensive assets where you left them!

10.     Proven's Website repeatedly advertises its locks with the phrase "Made in the USA" or an American flag logo and the phase "Made in the USA", examples of which are shown below:

3



**Proven's Social Media Posts Falsely Claim Its Products are "Made in the USA"**

11.     Proven also prominently claims that its locks are "Made in USA" in its social media posts.

12.     In the Proven Instagram post made on June 30, 2025, shown below, Proven asserts that its Model 2516 is "Made in the USA":



13.    Similarly, Proven's June 18, 2025, Instagram post, has text reading "Made in America" and the video opens with a shot of a trailer with a large American flag and the words "MADE IN THE USA":



Later in that same post, a close up of a Proven lock component is shown with "MFG. IN USA":

5



14.     The audio on Proven's June 18, 2025, Instagram post also promotes that its Model GPMAX lock uses an "Abloy Sentry lock core. Abloy is a Finnish company that manufactures its lock cores in Finland. Thus, the lock cores used in Proven's Model GPMAX are not "Made in America" or manufactured in the USA as Proven's Instagram post falsely asserts.

15.     On March 5, 2025, Proven's Instagram post falsely proclaimed that "we manufacture everything in the USA" as shown in the screenshot below:



16.     Proven's Instagram posts falsely claiming that its locks are "Made in America!" go back at least to January 19, 2023, as shown in the post below:



**Proven's Instagram Post Falsely Denying Its Locks are Made in China**

17.     On June 27, 2025, Proven made the Instagram post shown below stating "China Made Locks" "This is totally FALSE! We make everything here in America!":



7

18.     Despite its repeated representations, Proven does not "make everything here in America."

19.     The audio for Proven's June 27, 2025, social media post states, "I don't know where you got your information from. I don't know who your source is, but that is incorrect."

20.     Ironically, Mr. Lee himself admitted, while testifying under oath as Proven's corporate representative, that Proven imports some of its locks and most of its lock cores from China. Mr. Lee also testified that some of the lock cores used in Proven's locks come from Finland.

21.     Specifically, in his April 17, 2025, deposition as Proven's designated corporate representative, Mr. Lee testified:

> Q.  All right. And how about Proven Industries, **does Proven Industries import any product from outside the United States?**
> A.  **Yeah. Our lock cylinders**. (Emphasis added.)

April 17, 2025, Deposition of Ronald Lee, II, in the case styled *Ronald Lee, II, and Proven Industries, Inc. v. Pacific Lock Company and Gregory B. Waugh*, Case No. 8:24-cv-01667-SDM-UAM, (the "Lee Depo"), p. 17, lines 17 – 20. The cited portions of the Lee Depo are attached to this Complaint as Exhibit A.

> Q.  **What percentage of the cylinders that Proven Industries uses on its products are imported from China?**
> A.  **I'd feel comfortable around the 90 percent are imported.**
> Q.  Where does Proven Industries obtain the other approximate 10 percent of cylinders?
> A.  Well, actually, I might have misspoke here. So Proven Industries, I want to say **we personally, under Dynamic Manufacturing, import approximately 50 percent of our**

> **cylinders that we use, and then we have a vendor, which is --
> that makes up for the other 50 percent -- I'm saying
> approximately here.** It might be plus or minus. But that's kind of
> close -- close to where it's at. **And they import from China as
> well, and then they also are like a distributor of the cyl- --
> other -- the cylinders that are from, I guess, Finland** and some
> that are made domestically. (Emphasis added.)

*See Id.*, p. 18, line 16 through p. 19, line 7.

### **Defendants' False "Made in USA" Claim About Proven's GusHill USA Products**

22.    In 2019, Proven and Mr. Lee were sued for patent infringement by GusHill Industries, Inc. and, as part of the settlement of that case, Proven purchased GusHill Industries, Inc, according to Mr. Lee's deposition testimony.

23.    Proven now sells a product line that Proven calls "GusHill USA". Despite its name, Proven imports from China most of the products that Proven advertises and sells under the "GusHill USA" name.

24.    On April 17, 2025, Mr. Lee as Proven's corporate representative confirmed that Proven imports most of its GusHill USA products from China:

> Q.  **Does GusHill Industries LLC operate out of any of
> the addresses you gave?**
> A.  I mean, technically, yeah.  But at what capacity
> because it's a product.  **It's like a – that product line we
> don't manufacture.  We maybe manufacture a couple
> products, but it's more of a product we import** and -- off
> our design.  So it's maybe in 111, 112 for, like, storage.
> Q.  **And where does Proven Industries import the
> GusHill product from?**
> A.  **From China.** (Emphasis added.)

*See* <u>Exhibit A</u>, Lee Depo, at p. 17, lines 4 - 14.

25.    Although "GusHill USA" products are imported from China, Proven

advertises its GusHill USA products on the GusHill website ([www.gushill.com](www.gushill.com)) (the "GusHill USA Website") as "Made in the USA" as shown from the following screenshot taken from the homepage of the GusHill USA Website:



### Mr. Lee Falsely Claims Proven's Products are "Manufactured in the USA"

26.      Despite his sworn deposition testimony that Proven imports locks and lock cores from China and that other lock cores in its products are imported from Finland, Mr. Lee perjured himself to this Court by claiming "all" of Proven's products are manufactured in the United States".

27.      Mr. Lee's sworn declaration filed in the United States District Court for the Middle District of Florida on June 2, 2025, states in relevant part:

> **all** our products are manufactured in the United States using high-grade materials.  We proudly emphasize our commitment to quality, integrity, and **American manufacturing**.  (Emphasis added.)

Declaration of Ronald James Lee, II, In Support of Plaintiff's Emergency Motion for Preliminary Injunction and Incorporated Memorandum of Law [Dkt. #10-12], filed in the case styled *Proven Industries, Inc. v. Trevor McNally*, Case No. 8:25-cv-01119-MSS-

LSG (the "Lee Declaration") at paragraph 2. A copy of the Lee Declaration is attached to this Complaint as Exhibit B.

**Defendants' False "Made in USA" Claims Are Part Of A Longstanding Pattern**

28.     Defendants' repeated false claims that all their products are "Made in the USA" and "everything" sold by Proven is manufactured in the United States are part of their longstanding practice of deceptive, false, and unfair trade practices.

29.     In 2020 during a business dispute with PacLock, Proven and Mr. Lee registered the domain name <packlocks.com> in bad faith, as found by the Arbitration Panel in the ICANN Claim styled *Pacific Lock Company v. Ronald Lee / Proven Industries*, Claim No. FA2008001910564. A copy of the Decision in that ICANN Claim is attached to this Complaint as Exhibit C.

30.     On July 15, 2024, Mr. Lee and Proven sued PacLock and its CEO, Gregory Waugh in the case styled *Ronald Lee, II, and Proven Industries, Inc. v. Pacific Lock Company and Gregory B. Waugh*, Case No. 8:24-cv-01667-SDM-UAM (the "*Lee v. PacLock* Case"), falsely alleging among other contested claims that PacLock and Mr. Waugh tortiously interfered with Mr. Lee and Proven's "advantageous business relationship with their Patent Agent", Peter Ganjian, "by demanding that he cease representing Plaintiffs in patent matters." A copy of the Complaint in the *Lee v. PacLock* Case is attached to this Complaint as Exhibit D.

31.     Shortly after receiving the Complaint in the *Lee v. PacLock* Case, PacLock's counsel sent counsel for Mr. Lee and Proven the July 31, 2024, Declaration of Peter Ganjian (the "Ganjian Declaration"), which established the falsity of the

claim that PacLock and Mr. Waugh caused Mr. Ganjian to terminate his representation. In material part, the Ganjian Declaration states:

> Neither Mr. Waugh, Pacific Lock Company, nor anyone else ever demanded, requested, or even suggested that I cease representing Mr. Lee or Proven Industries, Inc.

> The decision to terminate my representation as a patent agent of Mr. Lee or Proven Industries, Inc. was entirely my own and was not, in any way, influenced by anyone else.

Ganjian Declaration at paragraphs 5 and 6. A copy of the Ganjian Declaration is attached as Exhibit E to this Complaint.

32.    Despite being provided with the Ganjian Declaration and the express request of counsel for PacLock and Mr. Waugh, Mr. Lee and Proven refused to drop the tortious interference claim regarding Mr. Ganjian, requiring PacLock and Mr. Waugh to defend that frivolous claim.

33.    Deposition testimony taken in the *Lee v. PacLock* Case established that Mr. Ganjian never served as Patent Agent for Proven. Rather, his patent agent services were performed at the direction and for the benefit of Dynamic Manufacturing Group, LLC, a different company owned by Mr. Lee. Such deposition testimony further established that the tortious interference claim by Mr. Lee and Proven was frivolous.

34.    Mr. Lee and Proven only dismissed their frivolous tortious interference claim against PacLock and Mr. Waugh after being served with a sanctions motion under Rule 11, Federal Rules of Civil Procedure.

35.    Moreover, Mr. Lee, who is a three-time convicted felon, has shown contempt for the judicial system. One of Mr. Lee's felony convictions was for witness

tampering and, as quoted above, Mr. Lee provided a false declaration to this Court in the *Proven v. McNally* case, in which Mr. Lee falsely claimed that "all our products are manufactured in the United States."

36.    PacLock has engaged the law firm of Fee & Jeffries, P.A. to represent and vindicate its interests in this case and is obligated to pay the firm reasonable attorneys' fees for that representation.

37.    All conditions precedent to the filing and maintenance of this action have been performed, have occurred, or have been excused or waived.

## COUNT I
## False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B)

38.    PacLock realleges and incorporates by reference the allegations in paragraphs 1 through 37.

39.    Proven's statements that that its products, including its GusHill USA products, are "Made in the USA", "Made in America", that Proven makes "everything here in America" "and that "we manufacture everything here in the USA" (the "False Made in USA Claims") are all false or misleading statements of fact about the geographic origin of Proven's products.

40.    Proven's False Made in USA Claims deceived or have the tendency to deceive a substantial segment of persons exposed to those claims.

41.    Proven's False Made in USA Claims are material and likely to influence the purchasing decisions of its potential customers.

42.    Proven caused its False Made in USA Claims to enter interstate

13

commerce through the Proven Website and its social media postings.

43.    Mr. Lee, as Proven's founder, President, and sole owner, controls and directs the activities of Proven, including its False Made in USA Claims.  As such, Mr. Lee is jointly and severally liable with Proven for those claims.

44.    PacLock, as a competitor of Proven, has been and is likely to continue to be injured through a loss of sales by Proven's False Made in USA Claims.

45.    Proven's blatant and ongoing False Made in USA Claims, especially when properly viewed as part of a pattern of abusive and unfair practices by Mr. Lee and Proven make this an exceptional case entitling PacLock to an award of its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

46.    PacLock will likely prevail on the merits of its false advertising claim because Proven's False Made in USA Claims are literally false and Mr. Lee, testifying in his capacity as Proven's designated corporate representative, admitted that many of Proven products and components of Proven's products are imported from China and Finland.

47.    PacLock is suffering and will continue to suffer irreparable harm as a result of Proven's continuing False Made in USA Claims.  The loss of customers and goodwill as a result of Proven's continuing False Made in USA Claims is not able to be compensated by and award money damages alone.

48.    The injuries to PacLock if Proven's False Made in USA Claims are not enjoined outweigh the injury to Proven if Proven is enjoined from continuing to make its False Made in USA Claims because Proven has no legal right to continue making

those false claims.

49.    Enjoining Proven from continuing to make its False Made in USA Claims will serve the public interest by protecting the public from Proven's false claims.

WHEREFORE PacLock respectfully requests that this Court:

A.    Enter judgment in its favor and jointly and severally against Defendants;

B.    Preliminarily and permanently enjoin Defendants from making any false or deceptive claims regarding the geographic source of any products that they advertise or sell;

C.    Order that Defendants publish corrective advertising proportionate to their False Made in USA claims;

D.    Award to PacLock and against Proven and Mr. Lee: (i) the amount of Proven's profits; (ii) three times the amount of PacLock's damages caused by Defendants' False Made in USA Claims; (iii) the costs of this action; and (iv) PacLock's reasonable attorneys' fees; and

E.    Grant to PacLock all other relief that this Court deems appropriate.

### COUNT II
### Deceptive and Unfair Trade Practices in Violation of
### § 502.201, et seq., Florida Statutes

50.    PacLock realleges and incorporates by reference the allegations in paragraphs 1 through 37, 39 through 44, and 47 through 49 above.

51.    Chapter 86 of the Code of Federal Regulations, part 37032, Section 323.2 ("Section 323.2") provides:

it is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), to label any product as Made in the United States unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States.

52. Guidance provided by the United States Federal Trade Commission (the "FTC") states:

> For a product to be called Made in USA, or claimed to be of domestic origin without qualifications or limits on the claim, the product must be "all or virtually all" made in the U.S.
>
> . . .
>
> "All or virtually all" means that the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States. That is, the product should contain no — or negligible — foreign content.

53. Proven's False Made in USA Claims constitute unfair or deceptive acts or practices within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1).

54. Proven's False Made in USA Claims also violate the FTC's standards for unqualified Made in USA claims.

55. Proven's False Made in USA Claims are deceptive and unfair trade practices that Defendants made in their conduct of trade and commerce.

56. Proven's False Made in USA Claims constitute deceptive and unfair trade practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

57.    PacLock has suffered and will continue to suffer actual damages as a result of Proven's False Made in USA Claims and resulting violations of FDUTPA.

58.    PacLock is likely to prevail on the merits of its claim against Defendants for their violations of FDUTPA because Proven's False Made in USA Claims are literally false and Mr. Lee, testifying in his capacity as Proven's designated corporate representative, admitted that many of Proven products and components of Proven's products are imported from China and Finland.

WHEREFORE PacLock respectfully requests that this Court:

A.    Enter judgment in its favor and jointly and severally against Defendants;

B.    Preliminarily and permanently enjoin Defendants from making any false or deceptive claims regarding the geographic source of any products that they advertise or sell or engaging in other deceptive or unfair trade practices;

C.    Order that Defendants publish corrective advertising proportionate to their False Made in USA claims;

D.    Award to PacLock and against Proven and Mr. Lee: (i) PacLock's damages caused by Defendants' deceptive and unfair trade practices; (ii) the costs of this action; and (iii) PacLock's reasonable attorneys' fees; and

E.    Grant to PacLock all other relief that this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

PacLock requests a trial by jury on all claims so triable.

Respectfully submitted:

July 18, 2025

/s/ Richard E. Fee
Richard E. Fee
Florida Bar No. 813680
Kathleen M. Wade
Florida Bar No. 127965
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008
(813) 229-0046 (Facsimile)
rfee@feejeffries.com
kwade@feejeffries.com
bszabo@feejeffries.com
valeshire@feejeffries.com

*Lead Trial Counsel for Plaintiff,*
*Pacific Lock Company a/k/a PACLOCK*

# EXHIBIT A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:24-CV-01667-SDM-UAM


Ronald Lee, II, and Proven,
Industries, Inc.,

          Plaintiffs,

-vs-

Pacific Lock Company, a/k/a
Paclock, and Gregory B. Waugh,

          Defendants.
_____/



VIDEOTAPED DEPOSITION OF THE CORPORATE REPRESENTATIVE OF
                PROVEN INDUSTRIES, INC.


                WITNESS:  RONALD LEE, II
                DATE:     Thursday, April 17, 2025
                TIME:     9:36 a.m. - 4:52 p.m.




                Johnson Pope, et al.
        400 North Ashley Drive, Suite 3100
                Tampa, Florida




            Stenographically Reported By:
                Joanne Caudill, FPR
            Florida Professional Reporter

```
 1                       APPEARANCES

 2

 3   On behalf of the Plaintiffs:
         JOHNSON POPE, ET AL
 4       400 North Ashley Drive
         Suite 3100
 5       Tampa, Florida 33602
         FRANKJ@JPFIRM.COM
 6       BY: FRANK R. JAKES, ESQUIRE

 7

     On behalf of the Defendants:
 8       FEE & JEFFRIES, P.A.
         1227 North Franklin Street
 9       Tampa, Florida 33602
         RFEE@FEEJEFFRIES.COM
10       BY: RICHARD FEE, ESQUIRE

11   Also Present:

12       Rick Spector, Videographer
         Greg Waugh

13

14                     -   -   -

15

16

17

18

19

20

21

22

23

24

25
```

Ronald Lee, II
April 17, 2025

1    A.    Yeah.  That's one of the trademarks, yeah.

2    Q.    Okay.  What's the official name of GusHill?

3    A.    GusHill Industries LLC.

4    Q.    Does GusHill Industries LLC operate out of any

5    of the addresses you gave?

6    A.    I mean, technically, yeah.  But at what

7    capacity because it's a product.  It's like a -- that

8    product line we don't manufacture.  We maybe manufacture

9    a couple products, but it's more of a product we import

10   and -- off our design.  So it's maybe in 111, 112 for,

11   like, storage.

12   Q.    And where does Proven Industries import the

13   GusHill product from?

14   A.    From China.

15   Q.    Anyplace else?

16   A.    I don't believe so.

17   Q.    All right.  And how about Proven Industries,

18   does Proven Industries import any product from outside

19   the United States?

20   A.    Yeah.  Our lock cylinders.

21   Q.    The -- could you describe for those of us who

22   aren't in the lock industry what a lock cylinder is?

23   A.    It's a cylinder that has a locking me- --

24   mechanism in it that you use a key to unlock.

25   Q.    So if -- if I was to envision a typical padlock

Ronald Lee, II
April 17, 2025

1   where it has the U-shaped closure and then it also has,

2   in a rather typical format, a square-ish-shaped block and

3   then there's on the bottom of some of them a place to

4   insert a key, is the cylinder the part that the key gets

5   inserted into?

6       A.   Yeah, that -- I think that sounds fair.

7       Q.   Okay.  Is that what you meant by cylinder?

8       A.   Correct.  Yeah.

9       Q.   Okay.  And does Proven Industries import all

10  its cylinders --

11      A.   No.

12      Q.   -- from China?

13      A.   Oh.  No.

14      Q.   Go ahead.

15      A.   No, we don't.

16      Q.   What percentage of the cylinders that Proven

17  Industries uses on its products are imported from China?

18      A.   I'd feel comfortable around the 90 percent are

19  imported.

20      Q.   Where does Proven Industries obtain the other

21  approximate 10 percent of cylinders?

22      A.   Well, actually, I might have misspoke here.

23           So Proven Industries, I want to say we

24  personally, under Dynamic Manufacturing, import

25  approximately 50 percent of our cylinders that we use,

Ronald Lee, II
April 17, 2025

1    and then we have a vendor, which is -- that makes up for

2    the other 50 percent -- I'm saying approximately here.

3    It might be plus or minus.  But that's kind of close --

4    close to where it's at.  And they import from China as

5    well, and then they also are like a distributor of the

6    cyl- -- other -- the cylinders that are from, I guess,

7    Finland and some that are made domestically.

8        Q.   And what is the name of that vendor that you

9    referenced?

10       A.   LSI.

11       Q.   Is there -- does LSI go by any other name?

12       A.   I don't know.  They have like -- they have

13   their own brand, Cobra.

14       Q.   Okay.  But it's not known -- LSI is not an

15   acronym for something as far as you know?

16       A.   Well, I thinks it's Lock -- Locking System

17   Incorporated.

18       Q.   Ah.

19       A.   Yeah.

20       Q.   Okay.

21       A.   Sorry.

22       Q.   Other than Proven Industries and Dynamic

23   Manufacturing, do any other businesses operate out of the

24   addresses you gave for Proven Industries?

25       A.   We did have -- because of our manufacturing

# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:25-cv-01119-MSS-LSG

Proven Industries Inc, a Florida corporation

    *Plaintiff,*

      v.

Trevor McNally, individual

    *Defendant.*

## Declaration of Ronald James Lee, II, In Support of Plaintiff's Emergency Motion for Preliminary Injunction and Incorporated Memorandum of Law

I, Ronald Lee, II, declare as follows:

1. I am over eighteen years of age and reside in the Middle District of Florida.

2. Proven Industries is a family-owned and operated business founded in response to the theft of a family trailer and over $40,000 worth of equipment. That loss became the catalyst for developing a superior line of trailer coupler locks. Since then, Proven has dedicated thousands of hours to engineering and testing our products. Each locking system is the result of, on average, more than 200 hours of research and development, and all our products are manufactured in the United States using high-grade materials. We proudly emphasize our commitment to quality, integrity, and American manufacturing. The family-run nature of the Proven business is central to its identity and customer relationships. When Proven's credibility and product

integrity are attacked publicly, as in the McNally Videos, it threatens the very core of the business Proven has built, undermining both the personal and professional trust that drives Proven's success.

3. I have over a decade of experience in business operations, manufacturing, and product development. In my role at Proven, I oversee all aspects of the company's operations, including product engineering, marketing, customer service, and strategic planning. My professional background includes years of hands-on experience in mechanical product design and development, as well as managing day-to-day operations in the security device manufacturing industry. I have led Proven's growth as an industry-recognized manufacturer of trailer hitch locks and related security products. My combined experience in engineering collaboration, product oversight, and business leadership enables me to testify competently about the matters addressed in this Declaration.

4. I am the President of Proven Industries Inc. ("Proven"), the Plaintiff in this matter. I make this declaration in support of Plaintiff's Motion for Preliminary Injunction. The facts stated in this declaration are based on my personal knowledge, including my direct observations and duties as President. If called as a witness, I could and would competently testify to the facts stated herein.

5. Proven designs, manufactures, and sells trailer hitch locks, including our signature product, the Latch Pin Lock. I oversee all aspects of Proven's business, including marketing strategy, product development, and customer communications.

Signature ref: eb4c6a20-cf4f-42cf-844c-58336dbf4b10

6. On March 3, 2025, Proven released a promotional video titled *YOU GUYS KEEP SAYING YOU CAN EASILY BREAK OFF OUR LATCH PIN LOCK* (the "Proven Video"). The video was registered by my attorney, Derek Fahey, Esq., with the U.S. Copyright Office on April 7, 2025 (Reg. No. PA 2-524-347). *See* Exhibit A, U.S. Reg. No. PA 2-524-347; *see* Exhibit B-1, copy of the Proven Video delivered on USB by Priority Mail.

7. I personally reviewed the public social media accounts of Defendant Trevor McNally ("Defendant"). As of April, and May 2025, I observed the following: Over 3.5 million subscribers on his YouTube channel; Over 2.5 million followers on TikTok; Over 500,000 followers on Instagram; and Over 260,000 followers on Facebook.
*See* Exhibit C, Screenshots of McNally's YouTube Channel, TikTok, Instagram, and Facebook.

8. Shortly after April 3, 2025, and several times after, I learned of and personally watched a video ("Part 1 Video") posted by McNally on TikTok, YouTube Shorts, Instagram Reels, and Facebook. The Part 1 Video begins by using approximately fifteen (15) seconds from the Proven Video, including our narration, visuals, and product demo without our permission. *See* Exhibit B-2, copy of Part 1 Video delivered on USB by Priority Mail.

9. I personally observed that the Part 1 Video shows McNally bypassing Proven's lock with a piece of aluminum can in roughly ten (10) seconds. Part 1 Video omits any explanation that he had previously disassembled or studied the lock to learn how the lock worked in order to fabricate a custom shim. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail. These

Signature ref: eb4c6a20-cf4f-42cf-844c-58336dbf4b10

omissions give a false impression that our lock is defective and easily bypassed by anyone without tools or skill.

10.     Part 1 Video also is completely devoid of how McNally knew how to make the shim, knew what dimensions or shape the shim should be in, or where to position the shim in order to open the lock. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail.

11.     Part 1 Video also is completely devoid of any explanation of how many times McNally practiced in order to open the lock. *See* Exhibit B-1, copy of Part 1 Video delivered on USB by Priority Mail.

12.     On April 4, 2025, I searched for and found at least two phone numbers that I thought could be Mr. McNally's phone numbers. I wanted to contact Defendant to ask him to take down the Part 1 Video and to try to resolve any dispute between us. These phone numbers were listed along with other numbers associated with Defendant's name and home address.

13.     On April 4, 2025, I texted at least two phone numbers that I thought could be the Defendant's phone number. *See* Exhibit D, Screenshot of text messages from Mr. Lee to two different phone numbers.

14.     I have personally tracked Part 1 Videos viewership and reposting. As of May 2025, I observed that it had accumulated more than 13 million views across platforms. I also reviewed hundreds of user comments referencing the Part 1 Video that were posted on Proven's social media channels and product listings.

15.     After the Part 1 Video, I personally handled or reviewed documentation including the following:

a) A product return explicitly citing the McNally Video (*see* Exhibit E);

b) A repeat customer that was hesitant to purchase after viewing the video. This customer had previously purchased from us multiple times and had never indicated any dissatisfaction with our products. However, due to the increased volume and stress caused by harassment from McNally's followers, our customer service team was unable to provide the level of support we normally offer, which contributed to the poor customer service (see Exhibit F); and

c) Reports, emails and messages from customer service about disruptive inquiries stemming from the video. (s*ee* Exhibit G).

16.    As part of my regular duties, I have access to the business records maintained in the ordinary course of Proven's operations and am familiar with the procedures for creating and maintaining such records.

17.    I was involved in Proven's decision to disable comments on multiple social media posts due to hostile and misleading user comments. Because of the large number of negative comments on the Proven Video as a result of the Part 1 Video, Proven disabled the comments from public viewing. Attached as Exhibit H are a comments posted on some of Proven's videos after Defendant published the Part 1 Video.

18.    I only learned about McNally's two additional videos (referred to as the Part 2 Video and the Part 3 Video) about Proven's locks after I started receiving phone calls and text messages on my personal cell phone.

19.    The Part 2 Video was posted on May 23, 2025, and the Part 3 Video was posted on May 25, 2025. McNally published the Part 2 Video and the Part

3 Video on TikTok, YouTube Shorts, Instagram Reels, and Facebook. *See* Exhibits B-3 and B-4, copies of Part 2 Video and Part 3 Videos, respectively, delivered on USB by Priority Mail.

20.     I have personally viewed the Part 2 and Part 3 Videos several times. Both the Part 2 and Part 3 Videos omit any explanation that McNally had previously disassembled or studied the lock to learn how the lock worked in order to fabricate a custom shim. *See* Exhibits B-3 and B-4, copies of Part 2 Video and Part 3 Videos, respectively, delivered on USB by Priority Mail. These omissions give a false impression that Proven's lock is defective and easily bypassed by anyone without tools or skill.

21.     Both the Part 2 and Part 3 Videos also are completely devoid of how McNally knew to make the shim, knew what dimensions or shape the shim should be in, or where to position the shim in order to open the lock.

22.     The Part 2 and Part 3 Videos also are completely devoid of any explanation of how many times McNally practiced in order to open the lock.

23.     After McNally published the Part 2 and Part 3 Videos, Proven's customer service department started receiving an increased amount of very disturbing messages from McNally social media followers. *See* Exhibit I.

24.     Since McNally published the Part 2 and Part 3 Videos, one of Proven's customers has said that they would not buy from Proven because Proven "harass[ed] someone's wife". *See* Exhibit J.

25.     On May 28, 2025, McNally published a fourth video ("Part 4 Video") targeting another Proven lock, this time installed on a cargo container. Like the earlier videos, the Part 4 Video depicts a supposed bypass using a

Signature ref: eb4c6a20-cf4f-42cf-844c-58336dbf4b10

shim but fails to explain how the shim was made, how it fits the specific locking mechanism, or whether any prior disassembly or practice was involved. The video falsely implies that the lock can be easily and quickly bypassed with common materials, when in reality, any such bypass would require advance planning, custom fabrication, and repeated trial and error. Although shorter than the prior videos, the Part 4 Video continues the misleading narrative that our locks are inherently insecure.

26.     The volume and tone of the messages received by Proven's team have created a disruptive and hostile work environment, raising concerns about employee well-being and safety. This has impaired internal morale and affected day-to-day operations. Specifically, one of Proven's customer services representatives, Mr. David Smith, complained about the hundreds of messages he received and read from McNally followers in the past few days. In an email, he complained about the disturbing messages he received and questioned if he should be concerned for his safety. *See* Exhibit K.

27.     My personal phone number was posted in the comments of the McNally Videos. Since that time, I have received a continuous stream of harassing phone calls and text messages from unknown numbers at all hours of the day and night. These communications have included profanity, threats, and racially charged language. *See* Exhibit L. My partner, Erin Schweitzer, has also received harassing messages through Facebook Messenger. *See* Exhibit M. Additionally, my son has received vile and threatening messages, including derogatory slurs and explicit threats of violence, such as "I would kill your fucking nigger child" and "racemixing pussy". *See* Exhibit N.

28.     The volume and nature of the harassing messages I received, along with those directed at my partner, son, and grandson, have caused significant emotional distress and disruption to my day-to-day operations as President of Proven. I have had to divert time from running Proven to manage the fallout, including blocking numbers, consulting with family members, and taking steps to ensure the safety and well-being of my son and grandchild. These intrusions have impacted my ability to focus on the business and have required personal and professional attention that would not have been necessary but for McNally's videos. The effect of this ongoing harassment underscores the seriousness and immediacy of the harm caused by McNally.

29.     In addition to me and my family being personally targeted as a result of the McNally videos, I have also observed my employees being called out and contacted by name. For example, one of our employees, Harrison Gammaro, was specifically mentioned in social media comments in a derogatory and harassing manner. Several employees have expressed concern for their own safety and well-being as a result of these comments and the surrounding harassment. This goes beyond my concern for Proven, as I am also concerned for my employees' safety and well-being. *See* Exhibit O.

30.     As a result of the fraudulent negative comments Proven's products, particularly on Amazon, Proven has a measurable decrease in revenue, has a measurable decrease in sales on Amazon, and has experienced permeant damages to its ability to sell its product – specifically Proven's product is not indexing on Amazon as normal and Proven cannot have "featured offers" on its product. *See* Exhibit P.

31.     After Part 1 of the McNally Videos was posted, I observed a noticeable decrease in revenue, an increase in advertising spend, and a decrease in conversion. From the period of April 3rd through May 28th vs previous period of February 6th through April 2nd, Proven saw a loss of revenue from combined Google Ads and Meta Ads conversion value vs previous. After Parts 2-4 of the McNally Videos were posted, I observed a further noticeable decrease in revenue. From May 23rd through May 28th vs previous period of May 17th through May 22nd, Proven saw a loss of revenue from combined Google Ads and Meta Ads conversion value vs previous. Since the string of recent videos started on May 23rd Proven has seen a large increase in negative comments on Meta Ad and Google Ad posts with many of them mentioning McNally or opening their locks with cans. *See* Exhibit Q.

32.     Based on my observations and leadership role, I believe that Proven is suffering irreparable harm. The McNally Video spreads a false implication that undermines Proven's credibility in the marketplace and for Proven's employees. The damage to Proven's reputation, goodwill, and customer relationships cannot be adequately remedied by money.

33.     After the McNally videos, there has been a substantial influx of messages and customer service tickets that have disrupted business operations. *See* Exhibit R.

34.     Based on my personal knowledge and past observations, I believe McNally's targeting of the Proven products was not isolated or accidental. I observed online that McNally previously posted a similar video falsely implying that another company's lock could be defeated with a milk jug. Like

with Proven's product, that video began with use of another company's promotional material, included theatrical behavior to increase engagement, and likely omitted key context. That prior video went viral, generating over 50 million views. I watched another video of McNally's acknowledging that the other company submitted a takedown notice, and McNally escalated the situation by publicly attacking them again. I believe McNally followed the same formula with Proven, deliberately crafting viral content that he knew from experience would mislead viewers and provoke harassment and increase revenue to his social media channels and affiliates. I also observe McNally frequently engaging with his followers in the comments. This pattern shows that McNally understands and exploits the foreseeable harm to the companies he targets. *See* Exhibit S.

35.    McNally's unauthorized use of Proven's video, along with his omission of critical facts and misleading demonstration, has caused ongoing harm to our business and brand. These harms are not speculative, they are measurable, immediate, and continuing. Based on my personal observations and business records reflecting the harm to Proven's operations, reputation, and revenue, I respectfully request that the Court grant the preliminary injunction to prevent further damage.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this <u>31st</u> day of <u>  May  </u>, 2025, in <u>  ruskin  </u>, Florida.

Signature ref: eb4c6a20-cf4f-42cf-844c-58336dbf4b10

Signature: _Ron Lee_

Name: Ronald James Lee, II

Title: President

Signature ref: eb4c6a20-cf4f-42cf-844c-58336dbf4b10

# Audit trail

| | |
|---|---|
| Name of the document | Declaration of Ronald Lee II.pdf |
| Signature reference ID | eb4c6a20-cf4f-42cf-844c-58336dbf4b10 |
| Date format | YYYY-MM-DD HH:MM:SS UTC |
| Status | SIGNED |
| Signing completed | 2025-05-31 19:52:41 UTC |

**Signing initiated**
2025-05-31 18:52:13 UTC

**Patent Specialist** (info@plusfirm.com) sent document for signing.

**Signers:**

   - **Ronald James Lee, II** (rlee@provenlocks.com)

Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36

IP: 2600:8800:6180:2600:2a:d16f:207f:ffd5

**Document signed**
2025-05-31 19:52:40 UTC

**Ronald James Lee, II** (rlee@provenlocks.com)

docbase-public

IP: 2603:900b:4f0:c430:98d0:541e:33e7:4a42

Authentication code: Not required

**Signing completed**
2025-05-31 19:52:41 UTC

Document was signed by using Pipedrive signing service.
We store viewing info only for signers that allow it. We show the first view from each signer.
Electronic signatures in this PDF document can be verified with Adobe Acrobat Reader.

**pipedrive**

# EXHIBIT C



EXHIBIT    16
WIT: R. Lee
DATE: 4-17-23
Joanne Caudill, FPR

# DECISION

Pacific Lock Company v. Ronald Lee / Proven Industries, Inc
Claim Number: FA2008001910564

## PARTIES

Complainant is **Pacific Lock Company** ("Complainant"), represented by **Gregory B. Waugh**, United States. Respondent is **Ronald Lee / Proven Industries, Inc** ("Respondent"), represented by **Mark Young, P.A.**, United States.

## REGISTRAR AND DISPUTED DOMAIN NAME

The domain name at issue is **<paclocks.com>**, registered with **GoDaddy.com, LLC**.

## PANEL

The undersigned certifies that he has acted independently and impartially and to the best of his knowledge has no known conflict in serving as Panelist in this proceeding.

David P. Miranda, Esq., as Panelist.

## PROCEDURAL HISTORY

Complainant submitted a Complaint to the FORUM electronically on August 29, 2020; the FORUM received payment on August 29, 2020.

On August 31, 2020, GoDaddy.com, LLC confirmed by e-mail to the FORUM that the **<paclocks.com>** domain name is registered with GoDaddy.com, LLC and that Respondent is the current registrant of the name. GoDaddy.com, LLC has verified that Respondent is bound by the GoDaddy.com, LLC registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On September 2, 2020, the FORUM served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of September 28, 2020 by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@paclocks.com. Also on September 2, 2020, the Written Notice of the Complaint, notifying Respondent of the e-mail addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

A timely Response was received and determined to be complete on September 28, 2020.

On October 5, 2020, pursuant to Complainant's request to have the dispute decided by a single-member Panel, the FORUM appointed David P. Miranda, Esq., as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the FORUM has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2.

## RELIEF SOUGHT

Complainant requests that the domain name be transferred from Respondent to Complainant.

## PARTIES' CONTENTIONS

A. Complainant

Complainant, Pacific Lock Company, produces physical security products such as padlocks and other locking devices. Complainant has rights in the PACLOCKS mark based upon registration with the United States Patent and Trademark Office ("USPTO") (*e.g.,* Reg. No. 5,982,640, registered Feb. 11, 2020). *See* Amend. Compl. Ex. A. Respondent's **<paclocks.com>** domain name is confusingly similar to Complainant's PACLOCKS mark and <paclock.com> domain name because the disputed domain name simply adds the letter "s" to Complainant's own domain name.

Respondent does not have rights or legitimate interests in the **<paclocks.com>** domain name because Respondent does not offer products or services related to the PACLOCK mark. Instead, Respondent uses the disputed domain name to host derogatory information about Complainant and redirect users to Complainant's own website.

Respondent registered and uses the **<paclocks.com>** domain name in bad faith. Respondent uses the disputed domain name as a coercion tool against Complainant. Additionally, Respondent's use of the disputed domain name to host derogatory information about Complainant evidences bad faith.

B. Respondent

Respondent contends that the **<paclocks.com>** domain name is not confusingly similar to the PACLOCKS mark. Additionally, Respondent registered the disputed domain name before Complainant attempted to register the PACLOCKS mark.

Respondent has rights and legitimate interests in the **<paclocks.com>** domain name since Respondent operates a business that corresponds with the disputed domain name. Additionally, Respondent's use of the domain name to host criticism of Complainant does not negate rights and legitimate interests.

Respondent's use of the **<paclocks.com>** domain name cannot be in bad faith because Respondent has legitimate business interests in the name. Also, Respondent's use of the disputed domain name to display criticism of Complainant is not evidence of bad faith.

The disputed domain name was registered on April 17, 2019. *See* Amend. Compl. Ex. B.

**FINDINGS**

Complainant has established each of the elements required under paragraph 4(a) of the Policy, and as such the domain name at issue shall be transferred from Respondent to the Complainant.

**DISCUSSION**

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and
(2) Respondent has no rights or legitimate interests in respect of the domain name; and
(3) the domain name has been registered and is being used in bad faith.

**<u>Identical and/or Confusingly Similar</u>**

Complainant asserts rights in the PACLOCKS mark based upon registration with the USPTO (*e.g.,* Reg. No. 5,982,640, registered Feb. 11, 2020). *See* Amend. Compl. Ex. A. Registration of a mark with the USPTO is generally sufficient to establish rights in the mark per Policy ¶ 4(a)(i). *See DIRECTV, LLC v. The Pearline Group*, FA 1818749 (FORUM Dec. 30, 2018) ("Complainant's ownership of a USPTO registration for DIRECTV demonstrate its rights in such mark for the purposes of Policy ¶ 4(a)(i)."). Since Complainant provides evidence of registration of the PACLOCKS mark with the USPTO, the Complainant has rights in the mark under Policy ¶ 4(a)(i).

Respondent's **<paclocks.com>** domain name is confusingly similar to Complainant's PACLOCKS mark and <paclock.com> domain name because the disputed domain name simply adds the letter "s" to Complainant's own domain name and the ".com" generic top-level domain ("gTLD") was added to the mark. Addition of the letter "s" and a gTLD to a mark does not negate confusing similarity under Policy ¶ 4(a)(i). *See LodgeWorks Partners, L.P. v. Isaac Goldstein / POSTE RESTANTE*, FA 1717300 (FORUM Apr. 5, 2017) ("The Panel agrees; Respondent's <archerhotels.com> is confusingly similar to complainant's ARCHER HOTEL mark."). Thus, the disputed domain name is identical or confusingly similar to Complainant's marks under Policy ¶ 4(a)(i).

Respondent argues that its **<paclocks.com>** domain name was registered prior to Complainant's alleged rights in the mark. However, because this argument is not applicable under Policy ¶ 4(a)(i), the argument will be presented under Policy ¶ 4(a)(iii).

**<u>Rights or Legitimate Interests</u>**

Complainant must first make a *prima facie* case that Respondent lacks rights and legitimate interests in the disputed domain name under Policy ¶ 4(a)(ii), then the

burden shifts to Respondent to show it does have rights or legitimate interests. *See Advanced International Marketing Corporation v. AA-1 Corp*, FA 780200 (FORUM Nov. 2, 2011) (finding that a complainant must offer some evidence to make its *prima facie* case and satisfy Policy ¶ 4(a)(ii)); *see also Neal & Massey Holdings Limited v. Gregory Ricks*, FA 1549327 (FORUM Apr. 12, 2014) ("Under Policy ¶ 4(a)(ii), Complainant must first make out a *prima facie* case showing that Respondent lacks rights and legitimate interests in respect of an at-issue domain name and then the burden, in effect, shifts to Respondent to come forward with evidence of its rights or legitimate interests").

Complainant argues that Respondent's use of the **<paclocks.com>** domain name to host derogatory information about Complainant and redirect to Complainant's website does not indicate rights and legitimate interests in the domain name. Use of a disputed domain name to host complaints or other information relating to the complainant does not necessarily indicate rights and legitimate interests under Policy ¶ 4(a)(ii). *See Compagnie Generale des Matieres Nucleaires v. Greenpeace Int'l*, D2001-0376 (WIPO May 14, 2001) (holding that the respondent's showing that it "has a right to free speech and a legitimate interest in criticizing the activities of organizations like the Complainant . . . is a very different thing from having a right or legitimate interest in respect of [a domain name that is identical to Complainant's mark]"). Similarly, diverting users to the complainant's legitimate webpage fails to create rights or legitimate interests in a domain name. *See Altavista Co. v. Brunosousa*, D2002-0109 (WIPO Apr. 3, 2002) ("[A]n unconnected party has no right or legitimate interest to use an otherwise deceptive trademark . . . even if it is directed to the legitimate owner of the trademark . . . ."). Complainant notes that the disputed domain name previously resolved to a webpage with derogatory information against Complainant and now redirects to Complainant's legitimate website. Respondent stated in an email to Complainant "I have redirected PACLOCKS.com to your website PACLOCK.Com and would like it to stay that way." Thus, the Panel finds that Respondent does not have rights and legitimate interests in the disputed domain name under Policy ¶ 4(a)(ii).

### Registration and Use in Bad Faith

Complainant argues that Respondent registered and uses the **<paclocks.com>** domain name in bad faith because Respondent uses the disputed domain name as a coercion tool against Complainant. Registration of a domain name by someone with a prior relationship with the complainant for the purpose of harming the complainant may evidence bad faith under Policy ¶ 4(a)(iii). *See William Hill Org. Ltd. v. Fulfillment Mgmt. Servs. Ltd.*, D2000-0826 (WIPO Sept. 17, 2000) (finding bad faith registration and use where "[R]espondent's employee must have had the Complainant's trade marks in mind when choosing the disputed domain name and that the respondent's interest was to deprive the complainant of the opportunity to reflect its mark in that name until the registration expires"). Complainant contends that the parties had a prior business relationship and Respondent registered the disputed domain name around the time the relationship was deteriorating. Complainant provides copies of emails between the parties and claims used its domain name ownership to obtain leverage over Complainant in their business relations. *See* Amend. Compl. Exs. D-F.

Additionally, Complainant claims that Respondent's use of the **<paclocks.com>** domain name to host derogatory information about Complainant evidences bad faith. Use of a disputed domain name to criticize a complainant may suggest bad faith pursuant to Policy ¶ 4(a)(iii). *See Watson Pharm., Inc. v. WhoisGuard*, FA 588321 (FORUM Dec. 19, 2005) ("Even if the goal of providing a free speech forum for criticizing Complainant is commendable, that goal cannot be reached by usurping Complainant's marks and posing as Complainant."). As previously noted, Complainant claims that the disputed domain name was previously used to host criticism of Complainant and its products. Complainant's federal trademark registration presumes a date of first use of May 1, 2018, prior to Respondent's domain registration. Respondent has not offered any proof denying the relationship between parties, or contesting Complainant's use of the mark prior to Respondent's domain registration. The Panel finds bad faith registration and use under Policy ¶ 4(a)(iii).

**DECISION**

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the **<paclocks.com>** domain name be **TRANSFERRED** from Respondent to Complainant.

David P. Miranda, Esq., Panelist
Dated: October 13, 2020

Click Here to return to the main Domain Decisions Page.

Click Here to return to our Home Page

# EXHIBIT D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Ronald Lee, II, and
Proven Industries, Inc.,

     Plaintiffs,

v.

                                             CASE NO.

Pacific Lock Company a/k/a Paclock
and Gregory B. Waugh,

     Defendants.

---

## **COMPLAINT**

    Plaintiffs, Ronald Lee, II ("Lee") and Proven Industries, Inc. ("Proven"), by and through their undersigned counsel, sues Defendants Pacific Lock Company a/k/a Paclock ("Paclock") and Gregory E. Waugh ( "Waugh" ) and alleges:

## NATURE OF THE ACTION

    1.    This is a civil action for injunctive relief, damages and other appropriate relief brought by Lee against Defendants, regarding a Mutual Non-Disclosure Agreement ("NDA") Defendant Paclock entered into with Lee, pursuant to which Lee disclosed to Defendants, in confidence, confidential and proprietary information involving the components of a trailer coupler trailer lock

1

designed by Lee along with market analysis and data research regarding this nascent market niche; and which Defendants have breached by using and misappropriating this confidential and proprietary information to permit Defendant Paclock manufacture a competing knock-off trailer coupler lock and introduce same into the nascent market niche created by Plaintiffs, all in violation of the Agreement; the Federal Defend Trade Secrets Act and the Florida Uniform Trade Secrets Act; Plaintiffs also seek redress for Defendants' tortious interference with Plaintiffs' advantageous business relationships.

<u>PARTIES</u>

2.     Plaintiff Lee is an individual who resides in the state of Florida in this district. Lee is the President and owner of Proven.

3.     Plaintiff Proven is a Florida corporation with its principal place of business at 2310 South Dock Street, Unit 111, Palmetto, Florida 34221

4.     Defendant Paclock is a California corporation with its principal place of business at 25605 Hercules Street, Valencia, CA 91355.

5.     Defendant Waugh is an individual who resides in the state of California. Defendant Waugh is Chief Executive Officer and a Director of Defendant Paclock.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(l) as the matter in controversy is between citizens of different states and exceeds the sum of $75,000.00, exclusive of costs and interest. Additionally, this court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c).

7.     At all times material, Defendants have conducted all business dealings and communications regarding sales of Paclock products for Proven's trailer coupler locks, directly with Lee, who is located in this judicial district.

8.     As alleged in greater detail below, Paclock, under the direction and control of Waugh, has engaged in tortious conduct directed toward Plaintiffs in this judicial district, and Paclock has breached a contract with Lee in this judicial district.

9.     As alleged in greater detail below, Paclock, under the direction and control of Waugh, sold and delivered a trailer coupler lock (the "UCS Lock" referenced below) to Proven in this judicial district.

10.     Paclock also operates a website accessible to Florida residents at www.paclock.com and actively sells products to Florida residents directly, through distributors and retailers located within the State of Florida.

11.     Accordingly, Paclock engages in business in the State of Florida within the meaning of Fla. Stat. § 48.193(2), and/or has otherwise engaged in conduct submitting Waugh and Paclock to the personal jurisdiction of this Court pursuant to Fla. Stat. § 48.192(1)(a)(1) by committing a tortious act against Plaintiffs within the State by misappropriating the confidential and proprietary information and trade secrets disclosed to Defendants under the NDA; pursuant to Fla. Stat. § 48.193(1)(a)(6) by causing injury to Plaintiffs through Defendants misappropriation in California and failure to maintain and protect the confidentiality of Plaintiffs' confidential and proprietary information and trade secrets while simultaneously manufacturing products used within the State of Florida; and, in the case of Paclock, pursuant to Fla. Stat. § 48.193(1)(a)(7) by breaching the NDA which required Paclock to maintain the confidentiality of Lee's confidential and proprietary information which resides in the State of Florida.

12.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.   Pursuant to Local Rule 1.04(b), this action is appropriately initiated in this Division.

13.     All conditions precedent to the commencement of this action, if any, have been performed, satisfied, waived, excused or have occurred.

## FACTUAL BACKGROUND

14.     On or about August 25, 2014, Lee and Paclock entered into the Mutual Non-Disclosure Agreement ("NDA") attached as Exhibit A. The effective date of the Agreement as set forth in the preamble is August 25, 2014. Lee and Waugh (on behalf of Paclock) initialed each page of the Agreement and signed and dated the last page of the Agreement.

15.     Lee is the founder and President of Proven, a Florida corporation formed by Lee for the purpose of producing and commercializing trailer coupler locks and related products.

16.     Lee formed Proven in 2011, after a family trailer was stolen with over $40,000 of equipment in it. A thief easily defeated a low-grade padlock that secured the trailer coupler.

17.     In response to the theft, Lee designed, developed and commercialized highly effective trailer coupler locks.

18.     Prior to August 25, 2014, Lee and Paclock discussed Proven using hidden shackle padlocks manufactured by Paclock. Due to their disc shape, hidden shackle padlocks are commonly referred to as "puck locks." Lee conceived of using Paclock's hidden shackle padlocks with a new trailer coupler lock conceived and designed by Lee (the "2516 Lock"); a design unknown to Paclock for a market niche that was untapped. The new trailer coupler lock was a premium

5

level coupler lock, assembled from fabricated components, for a common trailer coupler.  The fabricated components were made from steel pipe, steel plate, and a hidden shackle padlock.  The potential market for the 2516 Lock was and has since proven to be enormous.

19.    Prior to August 25, 2014, Lee did not disclose the 2516 Lock to any person or entity outside of Proven.

20.    Lee was reluctant to disclose the 2516 Lock to Defendants for several reasons.  Among these, Lee was concerned about the risk that Waugh would recognize the enormous market potential for the 2516 Lock in this untapped market niche, not supply hidden shackle padlocks to Proven, and/or introduce a competing trailer coupler lock having substantially the same design as the 2516 Lock for this untapped market of which Defendants were previously unaware.

21.    Lee's concerns were assuaged when Defendants agreed to enter into the NDA as a prerequisite to any consultation or collaboration. Once the NDA was executed, Lee relied upon Defendants' promises in the NDA to maintain the confidentiality of Lee's disclosures. Thus, Lee was able to consult with Defendants and determine, among other things, if Paclock's hidden shackle lock would fit the 2516 Lock with a full faceplate and an inner slide comprised of 1/4" thick steel plate.

22. On or about August 27, 2014, in a telephone conversation with Lee at his business office in Palmetto, Florida, Lee described, in confidence, to Defendants the 2516 Lock, including the full faceplate, the 1/4" thick slide and the market for the 2516 Lock as well as market data and projections for this nascent and untapped market niche.

23. A drawing of the 2516 Lock as described by Lee to Waugh in confidence is attached as Exhibit B.

24. The description of the 2516 Lock communicated to Waugh on or about August 27, 2014 along with market information and projections is confidential information under the NDA.

25. Pursuant to Section 2 of the NDA, Defendants agreed to refrain from using the confidential information, except for the purpose of considering collaboration between Lee and Defendants.

26. Pursuant to Section 7 of the NDA, Defendants agreed not to directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the confidential information.

27. During the fourth calendar quarter of 2014, Proven began purchasing hidden shackle padlocks from Paclock for incorporation into the 2516 Lock manufactured by Proven.

7

28.     Proven continued purchasing hidden shackle padlocks from Paclock until 2019.

29.     During this time frame, Defendants gleaned additional confidential and proprietary information within the protective umbrella of the NDA related to Lee's 2516 Lock unit volume and price margins along with other confidential and proprietary market data.

30.     In 2019 the relationship between Proven and Paclock deteriorated when Paclock began withholding keying combinations for existing key codes for locks manufactured by Paclok and sold to Proven.  Paclock withheld the key information to pressure Proven to enter into an omnibus purchasing agreement with Paclock.  Paclock refused to continue providing keying combinations for existing key codes to Proven, which made it impossible for Proven to provide support to its customers. Waugh even claimed that Proven was obligated to purchase from Paclock under a non-existent purchasing agreement. Ominously, Waugh threatened Lee about consequences of Proven ending its purchasing relationship with Paclock.

31.     In an email dated 4/19/2019 to Lee at his Palmetto, Florida offices, Waugh threatened: "And, just so we are all clear, if we cannot get ourselves re-aligned with a new agreement then it will be PACLOCK's intent to produce padlocks for your products, as we have been doing for years, selling them

everywhere we can (including Amazon) touting how these locks are truly the "original equipment manufacturer's locks" for your products and do so at a price substantially lower than what you sell them for today. Whether I sell just one or thousands, it won't really matter to PACLOCK. . . Rather the damage that will be dealt will be to Proven directly with its customer base and its bottom line. You will get lots of calls as to why the exact product being sold by Proven is double the cost. I think you'll have a tough time justifying your past sales and any future sales."

32. Despite Defendants' threats, Plaintiffs elected to cease sourcing its puck locks from Defendants. At the time, Defendants appeared to take no steps to back up Waugh's threats.

33. However, about a year later, out of apparent disgruntlement with Plaintiffs' refusal to capitulate to their threats, Defendants contacted the parties' common Patent Agent and demanded that the Patent Agent cease representing Proven. As a consequence of Defendants' interference, the Patent Agent withdrew from representing Proven, delaying the prosecution of Proven's patent filings and necessitating the retention of a new Patent Agent, all to Proven's financial detriment.

34. On or about September 19, 2023, Paclock began producing and selling a trailer coupler lock, designated the UCS-77S Heavy-Duty Trailer Coupler Lock (the "UCS Lock").

35.    Paclock sold UCS Locks through online retailer 1st-In-Padlocks .com LLC ("1stIP"), an Idaho limited liability company, doing business as 1st-In-Padlocks.  1stIP offered UCS Locks for sale from its website at www.1st-in-padlocks.com to consumers throughout North America including residents of Florida.  A copy of a posting for the UCS Lock is attached as Exhibit C.

36.    On or about January 5, 2024, Lee ordered a UCS Lock from www.1st-in-padlocks.com . Paclock fulfilled the order by shipping a Paclock manufactured UCS Lock to Plaintiffs in their Palmetto offices in Florida.

37.    Photos of the UCS Lock are attached as Exhibit D.

38.    The UCS Lock includes a full faceplate and an inner slide comprised of 1/4" steel plate.

39.    On or about January 8, 2024, Plaintiffs informed Defendants, *inter alia*, that they breached the NDA by causing, directing and authorizing Paclock to design, create, manufacture and sell the UCS Lock.

40.    On February 2, 2024, Plaintiffs demanded that LMH cease and desist further sales of the UCS Locks.  LMH appears to have complied with the demand.

41.    However, upon information and belief, Defendants continue to manufacture, market, offer to sell and sell the UCS Lock throughout the United States including in the State of Florida and this District either directly or indirectly through other distributors.

## COUNT I
## BREACH OF CONTRACT BY PACLOCK

42.    Lee incorporates the allegations contained in Paragraphs 1 through 41 as if fully set forth herein.

43.    Paclock entered into a valid Mutual Non-Disclosure Agreement with Lee for good and valuable consideration.

44.    Pursuant to Section 2 of the NDA, Paclock agreed to refrain from using the confidential information, except for the purpose of considering collaboration between Lee and Paclock.

45.    Pursuant to Section 7 of the NDA, Paclock agreed not to directly or indirectly acquire any interest in, or design, create, manufacture, reengineer, sell or otherwise deal with any item or product, containing, based upon or derived from the confidential information.

46.    Paclock's actions constitute a material breach by Paclock of Section 2 of the NDA.

47.    Paclock's actions constitute a material breach by Paclock of Section 7 of the NDA.

48.    As a result of the material breaches of the Agreement by Paclock, Lee has suffered damages in excess of $75,000, plus interest, costs and attorneys' fees.

49.    Because Lee is without an adequate remedy at law for Paclock's breaches, Defendants should be preliminarily and permanently enjoined from

using a full faceplate and a 1/4" thick slider in any trailer coupler lock made, used, sold or offered for sale.

COUNT II
VIOLATION OF THE FEDERAL DEFENSE OF TRADE SECRETS ACT

50.    Plaintiffs reincorporate the allegations set forth in the preceding paragraphs 1 – 41 as if stated in full.

51.    This is a claim for violation of the Federal Defend Trade Secrets Act of 2016 (the "DTSA"), codified at 18 U.S.C. § 1836 and in related sections.

52.    Plaintiffs own, have, maintain and continue to have and maintain Trade Secrets.

53.    Plaintiffs' Trade Secrets derive actual independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value the their disclosure or use.

54.    The Defendants acquired, used, and disclosed the Plaintiffs' Trade Secrets under circumstances that imposed duties on Defendants to maintain the secrecy of those Trade Secrets, and to preclude the use of these Trade Secrets by anyone other than Plaintiffs.

55.    By virtue of the explicit provisions of the NDA, Defendants owed Plaintiffs a duty not to use or disclose these Trade Secrets to others, or to benefit themselves or others.

56.     Defendants have misappropriated the Plaintiffs' Trade Secrets. This misappropriation has damaged Plaintiffs.

57.     Defendants' misappropriation was willful and malicious, in that, without limitation, Defendants knew that Plaintiffs had developed and protected their Trade Secrets, and had imposed a duty of confidentiality on the Defendants, entrusting them with the Trade Secrets and reasonably expecting that they would not misappropriate these Trade Secrets.

58.     Plaintiffs are without an adequate remedy of law, and are suffering irreparable harm from Defendants' misappropriation.

COUNT III
VIOLATION OF THE FLORIDA UNIFORM TRADE SECRETS ACT

59.     Plaintiffs reincorporate the allegations set forth in the preceding paragraphs 1 – 41 as if stated in full.

60.     This is a claim for violation of the Florida Uniform Trade Secrets Act (the "FUTSA"), codified at Chapter 688.001 *et seq.*, Florida Statutes.

61.     This Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367 because the facts underlying this claim are the same as those facts underlying the preceding DTSA claim.

62.     The Defendants had a duty to maintain the secrecy of Plaintiffs' Trade Secrets and not to use these Trade Secrets for their own financial gain.

63.     This duty arose from the NDA.

13

64. Having this pre-existing duty, Defendants improperly misappropriated and stole these Trade Secrets, and used them to create the UCS Lock and manufacture and market the UCS Lock throughout the United States, including within the State of Florida.

65. Plaintiffs have not consented to Defendants' use of their Trade Secrets.

66. Defendants knew that their misappropriation and use of Plaintiffs' Trade Secrets was not authorized by Plaintiffs.

67. Plaintiffs' have been damaged by Defendants' misappropriation of Plaintiffs' Trade Secrets.

68. Plaintiffs are without an adequate remedy of law, and are suffering irreparable harm from Defendants' misappropriation.

## COUNT IV
## <u>TORTIOUS INTERFERENCE</u>

69.    Plaintiffs reincorporate the allegations set forth in the preceding paragraphs 1 – 41 as if stated in full.

70.    Plaintiffs possessed an advantageous business relationship with their Patent Agent, Peter Ganjian.

71.    Defendants have intentionally and without justification interfered with Plaintiffs' advantageous business relationship with their Patent Agent by demanding that he cease representing Plaintiffs in patent matters.

72.    As a proximate result of Defendants' interference, Plaintiffs have sustained economic loss, injury, and damage, in excess of $75,000 plus attorneys' fees and costs, but in an amount to be proven at trial.

73.    Defendants' tortious interference with Plaintiffs' advantageous business relationship with their Patent Agent was willful, wanton and malicious and in full derogation of Plaintiffs' legal rights.

74.    Paclock's conduct was malicious, intentional, unjustified and interfered with and caused material breaches of Sections 2 and 7 of the Agreement.

75.    Paclock's conduct was in wanton disregard of its contractual obligations under Sections 2 and 7 of the Agreement. This interference was intentional and without justification or privilege.

76.     As a result of Paclock's intentional and improper interference, Lee was damaged in an amount to be determined at trial, but which exceeds $ 75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court enter one or more orders granting the following relief:

A) The entry of a preliminary and permanent injunction enjoining Defendants from directly or indirectly making, using, selling and offering to sell any trailer coupler lock that includes a full faceplate and a 1/4" thick slider or in any further way exploiting Plaintiffs' confidential and proprietary Trade Secrets;

B)  The entry of a judgment for monetary damages against Defendant Paclock and in favor of Lee for breach of the NDA;

C)  The entry of a judgment for monetary damages against Defendants for violation of the DTSA for the actual loss caused by Defendants' misappropriation of Plaintiffs' Trade Secrets, or in the alternative to the preceding, imposing a reasonable royalty for Defendants' misappropriation;

D) Awarding Plaintiffs exemplary damages in a sum double its monetary damages for violation of the DTSA;

E)  Awarding Plaintiffs damages for the actual loss caused by Defendants' misappropriation of Plaintiffs' Trade Secrets, or for unjust enrichment, or in

the alternative to the preceding, imposing a reasonable royalty for Defendants' misappropriation in violation of the FUTSA;

F) Awarding Plaintiffs exemplary damages in a sum double its monetary damages for violation of the FUTSA;

G) The entry of a judgment for monetary damages against Defendants for tortious interference with Plaintiffs' advantageous business relationship with their Patent Agent;

H) Awarding Plaintiffs' exemplary damages in an amount not less than $500,000 for the willful, wanton and malicious tortious interference with Plaintiffs' advantageous business relationship with its Patent Agent;

I) Awarding Plaintiffs their reasonable attorneys' fees under Counts II & III;

J) Awarding Plaintiffs their costs; and

K) An award of such other relief that this honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

> /s/ *Frank R. Jakes*
> Frank R. Jakes, FBN 372226
> Trial Counsel
> JOHNSON, POPE, BOKOR,
>   RUPPEL & BURNS, LLP
> 400 North Ashley Drive, Suite 3100
> Tampa, FL 33602
> (813) 225-2500
> (813) 223-7118 (Fax)
> E-Mail: frankj@jpfirm.com

# EXHIBIT E

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

Ronald Lee, II, and Proven,
Industries, Inc.,

        **Plaintiffs,**

                                **Case No.: 8:24-cv-01667-SDM-UAM**

v.

Pacific Lock Company a/k/a Paclock
and Gregory B. Waugh,

        **Defendants.**

_____/

## DECLARATION OF PETER GANJIAN

Pursuant to 28 U.S.C. § 1746, I, Peter Ganjian, state under penalty of perjury
that the following is true:

1.     I am over the age of 18, sui juris, and make this declaration of my own
personal knowledge.

2.     I am personally familiar with the facts set forth in this Declaration and,
if called upon to testify as a witness in the instant action, I could and would be able to
competently testify as to the facts herein.

3.     I have reviewed the allegations in paragraph 71 of Count IV of the
Complaint in this case.

4.     Paragraph 71 of the Complaint, which is part of Count IV, falsely asserts
that Defendants, Pacific Lock Company and Gregory B. Waugh, demanded that I

cease representing Plaintiffs, Ronald Lee, II and Proven Industries, Inc., in my capacity as a patent agent.

5.     Neither Mr. Waugh, Pacific Lock Company, nor anyone else ever demanded, requested, or even suggested that I cease representing Mr. Lee or Proven Industries, Inc.

6.     The decision to terminate my representation as a patent agent of Mr. Lee or Proven Industries, Inc. was entirely my own and was not, in any way, influenced by anyone else.

7.     I never communicated or otherwise indicated to Mr. Lee or Proven Industries, Inc. that my decision to terminate my representation of them resulted from any demand or request from Mr. Waugh, Pacific Lock Company, or anyone else.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Los Angeles County, Montrose, California, this 31st day of July, 2024.

Peter Ganjian

2

JS 44 (Rev. 03/22)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Pacific Lock Company, a/k/a PacLock

**DEFENDANTS**

Proven Industries, Inc., and Ronald Lee, II

**(b)** County of Residence of First Listed Plaintiff   <u>Los Angeles County</u>
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Richard E. Fee, Fee & Jeffries, P.A., 1227 N. Franklin St., Tampa, FL 33602; 813-229-8008

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☒ 840 Trademark | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Lanham Act, 15 U.S.C. § 1125(a)

Brief description of cause:
False and Deceptive Advertising

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE   Steven D. Merryday

DOCKET NUMBER   8:24-cv-1667-SDM-LSG

DATE   July 18, 2025

SIGNATURE OF ATTORNEY OF RECORD   /s/ Richard E. Fee

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE